UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

RYAN MAHAN, *et al.*,

                  **Plaintiffs,**

   vs.                                     1:24-CV-880
                                             (MAD/PJE)

COUNTY OF SARATOGA,

                  **Defendant.**

---

APPEARANCES:                             OF COUNSEL:

**ISAACS DEVASIA CASTRO & WIEN LLP**    **HOWARD G. WIEN, ESQ.**
75 South Broadway, 4th Floor
New York, New York 10601
Attorney for Plaintiffs

**MCGILLIVARY STEELE ELKIN LLP**        **SARAH M. BLOCK, ESQ.**
1101 Vermont Avenue Northwest, Suite 1000   **GREGORY K. MCGILLIVARY, ESQ.**
Washington, D.C. 20005                  **RACHEL LERNER, ESQ.**
Attorneys for Plaintiffs

**BARTLETT, PONTIFF, STEWART**        **JOHN D. WRIGHT, ESQ.**
**& RHODES, P.C.**                      **MATTHEW J. MCAULIFFE, ESQ.**
One Washington Street
P.O. Box 2168
Glens Falls, New York 12801
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiffs brought this putative collective action, pursuant to the Fair Labor Standards Act ("FLSA"), on July 16, 2024. *See* Dkt. No. 1. Plaintiffs are all current or former employees of Saratoga County, New York ("Defendant" or "the County"), and have held various positions in

the Saratoga County Sheriff's Department.  *See id.* at ¶ 1.  The complaint raises three causes of

action: (1) failure to pay overtime for hours worked in excess of forty hours per week; (2) failure

to properly calculate Plaintiffs' regular pay rate; and (3) failure to pay overtime in a timely

manner.  *See id.* at ¶¶ 43-59.  Plaintiffs also request liquidated damages with respect to each

claim.  *See id.* at ¶¶ 47, 52, 58.  Plaintiffs have not yet moved for certification of their proposed

collective, but the complaint alleges that Plaintiffs are similarly situated because they have been

subjected to the same County policies that purportedly violate the FLSA.  *See id.* at ¶ 2.

On August 15, 2025, Plaintiffs filed a motion for summary judgment as to Defendant's

FLSA liability.[1]  *See* Dkt. No. 35.  Defendant opposed the motion on October 6, 2025, *see* Dkt.

No. 38, and Plaintiffs filed a reply on October 16, 2025, *see* Dkt. No. 39.  Seventy Plaintiffs have

opted into the action and are named as parties to the motion.[2]  *See* Dkt. Nos. 1-1, 15-1, 22-1, 30-1,

35.  Ten Plaintiffs were selected as discovery plaintiffs: Michael Bedell, Jayme Benoit, Clayton

Brownell, Kevin Ferris, Michael Grigas, William Kitts, Christopher Kyne, Ryan Mahan, Kyle

Rossi, and Robert Swatling.  *See* Dkt. No. 35-2 at 1 n.1.  Defendant deposed all discovery

plaintiffs except Plaintiff Benoit.  *See id.*  Plaintiffs submit all nine discovery plaintiff depositions

---

[1] Plaintiffs' motion states that they "are not moving for summary judgment on the issue of whether the County willfully violated the FLSA." Dkt. No. 35-1 at 27 n.4.  If an employer's conduct willfully violates the FLSA, the typical two-year statute of limitations is extended to three years. *See Zhang v. Ichiban Grp., LLC*, No. 1:17-CV-148, 2023 WL 6122847, *4 (N.D.N.Y. Sept. 19, 2023) (citing 29 U.S.C. § 255(a)).  Plaintiffs also request sixty days to collaborate with Defendant on resolving the quantum of damages without further intervention from this Court.  *See* Dkt. No. 35-1 at 10 n.2.

[2] The docket entry for the summary judgment motion lists Rachel Nicotra among the Plaintiffs who are parties to the motion.  *See* Dkt. No. 35.  Nicotra was the parties' assigned mediator earlier in this litigation.  *See* Dkt. No. 23.  Thus, the Court believes that Nicotra's inclusion on the list of Plaintiffs was erroneous.  Also, the motion's docket entry lists a party named Shields Nelson, *see* Dkt. No. 35, but Plaintiffs do not appear to have filed an opt-in form for anyone by that name. The Court notes that Plaintiffs with the last names Nelson and Shields have opted in, *see* Dkt. No. 1-1 at 32; Dkt. No. 22-1 at 13-14, and assumes that Shields Nelson was included erroneously.

with their motion.  *See* Dkt. Nos. 35-8 to 35-16.  They also submit deposition testimony of Chief Deputy Pat Maswich, Human Resources Director Scot Chamberlain, and Administrative Coordinator Heather Bessette; the County's overtime policy; and a declaration of Dr. Louis Lanier, Plaintiffs' expert witness.  *See* Dkt. Nos. 35-4 to 35-7, 35-17.  In opposition, Defendant submits several internal Sheriff's Department communications; job descriptions; various Sheriff's Office manuals; the applicable collective bargaining agreement ("CBA"); a sworn affidavit from Maswich; deposition testimony of Maswich, Chamberlain, and Bessette; and deposition testimony of all discovery plaintiffs except Plaintiffs Benoit and Brownell.  *See* Dkt. Nos. 38-1 to 38-17.

Plaintiffs' motion for summary judgment is now before the Court.  For the reasons stated below, the motion is granted in part and denied in part.

## II. BACKGROUND

### A.    Defendant's Timekeeping Systems

Plaintiffs are Saratoga County Deputy Sheriffs, Sergeants, Investigators, School Resource Officers ("SROs"), and K-9 Officers.  *See* Dkt. No. 35-2 at ¶ 1; Dkt. No. 38-19 at ¶ 1.  SROs and K-9 Officers are subclasses of Deputy Sheriffs.  *See* Dkt. No. 35-2 at ¶ 2; Dkt. No. 38-19 at ¶ 2. Deputy Sheriffs work at the County's Public Safety Building in Ballston Spa, New York, or at one of five substations, each of which has a locker room.  *See* Dkt. No. 35-2 at ¶¶ 5-7; Dkt. No. 38-19 at ¶¶ 5-7.  Sergeants work at the Public Safety Building or the County's substations in Halfmoon or Wilton, New York.  *See* Dkt. No. 35-2 at ¶ 8; Dkt. No. 38-19 at ¶ 8.  Investigators work at the Public Safety Building.  *See* Dkt. No. 35-2 at ¶ 9; Dkt. No. 38-19 at ¶ 9.  SROs are assigned a substation, but usually report directly to their schools, and K-9 Officers report directly to their zone assignments in the field.  Dkt. No. 35-2 at ¶¶ 10-11; Dkt. No. 38-19 at ¶¶ 10-11.  The parties

do not dispute the primary job functions of each position.  *See* Dkt. No. 35-2 at ¶¶ 12-16; Dkt. No. 38-19 at ¶¶ 12-16.

To record their hours worked, Deputy Sheriffs, Sergeants, and Investigators use a manual punch clock.  *See* Dkt. No. 35-2 at ¶ 17; Dkt. No. 38-19 at ¶ 17.  Using County-provided timecards, these employees record their clock-in and clock-out times by punching their cards at the beginning and end of each shift.  *See* Dkt. No. 35-2 at ¶¶ 19, 21-22; Dkt. No. 38-19 at ¶¶ 19, 21-22.  K-9 Officers also use timecards, but they handwrite their clock-in and clock-out times instead of using a punch clock.  *See* Dkt. No. 35-2 at ¶¶ 23-24; Dkt. No. 38-19 at ¶¶ 23-24.  SROs fill out an electronic timecard by entering their hours worked into an Excel, Word, or Adobe template.  *See* Dkt. No. 35-2 at ¶¶ 26-27; Dkt. No. 38-19 at ¶¶ 26-27.  All employees are expected to manually note shift swaps, vacation days, compensatory time, and overtime on their timecards. *See* Dkt. No. 35-2 at ¶ 28; Dkt. No. 38-19 at ¶ 28.  The parties agree that there are electronic indicators of employees' whereabouts, including badge scans to enter the Public Safety Building parking lot, cameras at the Public Safety Building and Halfmoon substation, key fobs for building and locker room access, and records of when body cameras are docked and undocked.  *See* Dkt. No. 35-2 at ¶¶ 154-57; Dkt. No. 38-19 at ¶¶ 154-57.

The parties do not dispute that the County uses a quarter-hour rounding system when employees clock in outside their scheduled shifts.  *See* Dkt. No. 35-2 at ¶ 30; Dkt. No. 38-19 at ¶ 30.  However, they dispute how the rounding occurs.  According to Plaintiffs, Sheriff's Department employees may not clock in any earlier than seven minutes before their scheduled shift start times, which means all their pre-shift time worked is rounded down to the nearest quarter-hour.  *See* Dkt. No. 35-2 at ¶¶ 31-32.  Defendant claims that employees are required to punch in before starting work, and if an employee clocks in more than seven minutes earlier than

their scheduled shift start time, "the time will be rounded up."[3]  Dkt. No. 38-19 at ¶¶ 31-32.

However, Defendant does not dispute Plaintiffs' assertion that whenever an employee clocks in

within the seven-minute pre-shift window, the County rounds the time down and does not pay for

the extra time worked.  *See* Dkt. No. 35-2 at ¶ 33; Dkt. No. 38-19 at ¶ 33.

Employees' timecards are submitted biweekly to Administrative Coordinator Bessette and

Julie Grant, the Clerk to the Sheriff.  *See* Dkt. No. 35-2 at ¶ 35; Dkt. No. 38-19 at ¶ 35.  Bessette

and Grant total each employee's hours worked, as well as any applicable overtime or

compensatory time, and enter those figures into the County's payroll system.  *See* Dkt. No. 35-2 at

¶¶ 36, 39; Dkt. No. 38-19 at ¶¶ 36, 39.  They do not calculate how much money each employee

will be paid, *see* Dkt. No. 35-2 at ¶ 40; Dkt. No. 38-19 at ¶ 40, nor do they enter employees'

punch times into the payroll system, *see* Dkt. No. 35-2 at ¶ 41; Dkt. No. 38-19 at ¶ 41.  Based on

the total number of hours entered, the County Treasurer's Office generates employees' paychecks.

*See* Dkt. No. 35-2 at ¶ 42; Dkt. No. 38-19 at ¶ 42.

**B.      Deputy Sheriffs' Alleged Unpaid Work**

Deputy Sheriffs work five eight-hour shifts each week.  *See* Dkt. No. 35-2 at ¶¶ 46-48;

Dkt. No. 38-19 at ¶¶ 46-48.  They are required to be called into service[4] fifteen minutes after the

scheduled start of their shifts.  *See* Dkt. No. 35-2 at ¶ 50; Dkt. No. 38-19 at ¶ 50.  Plaintiffs claim

---

[3] For example, if an employee's shift is scheduled to start at 7:00 A.M., but the employee clocks in between 6:53 A.M. and 6:59 A.M., their clock-in time is rounded down to 7:00 A.M.  *See* Dkt. No. 38-6 at 53:1-25, 54:1-8.  By extension, Defendant appears to claim that if the employee clocked in between 6:46 A.M. and 6:52 A.M., their clock-in time would be rounded to 6:45 A.M.

[4] Plaintiffs use the phrase "called into service" in their papers.  *See, e.g.*, Dkt. No. 35-1 at 11; Dkt. No. 35-2 at ¶¶ 50, 75, 107, 139.  The Court understands calling into service to be separate from clocking in.  For example, Plaintiffs' motion explains that Deputy Sheriffs must call into service fifteen minutes after their shifts begin.  *See* Dkt. No. 35-1 at 11.  However, Plaintiffs do not expressly define what constitutes calling into service.

that in order to complete all their necessary preparatory work before being called into service, Deputy Sheriffs often begin working ten to thirty minutes before their scheduled start times. *See* Dkt. No. 35-2 at ¶¶ 51, 54. For example, Plaintiffs claim that before their shifts begin, Deputy Sheriffs must obtain body cameras, radios, patrol vehicle keys, and guns; speak with Sergeants or Lieutenants about their upcoming shifts; view case reports on the computer; complete paperwork; inspect their patrol vehicles; and log into various computer programs in the vehicles. *See id.* at ¶¶ 55, 58-61, 64, 73-74. They also claim they are required to change into their uniforms, which include a duty belt, taser, handcuffs, magazines, firearm, and pepper spray, in the on-premises locker rooms. *See id.* at ¶¶ 65-68.

In its response to Plaintiffs' statement of material facts, Defendant asserts that these tasks are not required to be done before an employee's shift begins, employees must punch in before starting their work, and they are not required to put on their uniforms in the Sheriff's Department locker rooms. *See* Dkt. No. 38-19 at ¶¶ 51, 54-55, 58-61, 64-65, 67-68. Rather, according to Defendant, Plaintiffs are allowed to wear their uniforms to and from work. *See id.* at ¶ 68.

According to Plaintiffs, Deputy Sheriffs perform their start-of-shift tasks in a variety of orders. *See* Dkt. No. 35-2 at ¶ 75. Moreover, Plaintiffs claim that Deputy Sheriffs are not prevented from working earlier than their scheduled start times, nor has any Deputy Sheriff been disciplined for doing so. *See id.* at ¶ 78. Defendant challenges those allegations and reiterates that Plaintiffs must punch in before starting work. *See* Dkt. No. 38-19 at ¶ 78.

**C.    Sergeants' Alleged Unpaid Work**

Like Deputy Sheriffs, Sergeants work five eight-hour shifts per week. *See* Dkt. No. 35-2 at ¶¶ 79-80; Dkt. No. 38-19 at ¶¶ 79-80. Sergeants also allegedly begin working more than seven minutes prior to their scheduled shift times because they must complete numerous preparatory

tasks. *See* Dkt. No. 35-2 at ¶¶ 82-83. According to Plaintiffs, Sergeants perform these tasks in a variety of orders. *See id.* at ¶ 107.

Plaintiffs allege that Sergeants must create schedules and zone assignments for Deputy Sheriffs, as well as obtain body cameras, radios, and patrol vehicle keys. *See id.* at ¶¶ 84, 87-88, 90-91. They must also inspect their patrol vehicles and log into various computer programs before calling into service. *See id.* at ¶¶ 95-96; Dkt. No. 38-19 at ¶¶ 95-96. Plaintiffs claim that the schedules and zone assignments are emailed to all Deputy Sheriffs, Lieutenants, Captains, the Chief, and the Sheriff, and that Sergeants frequently send these emails before their scheduled shifts so everyone has their assignments on time. *See* Dkt. No. 35-2 at ¶¶ 92-93, 148-50. Defendant contends these tasks are to be performed after a Sergeant clocks in. *See* Dkt. No. 38-19 at ¶¶ 82-84, 87-91, 93, 148.

The parties also disagree on whether Sergeants work outside their shifts by doing shift briefings with Sergeants from other shifts, and whether Sergeants are required to change into their full uniforms in the on-premises locker rooms. *See* Dkt. No. 35-2 at ¶¶ 94, 97, 99-100, 102, 146; Dkt. No. 38-19 at ¶¶ 94, 97, 99-100, 102, 146. Sergeants wear the same uniforms that Deputy Sheriffs wear, and Plaintiffs claim they take five to ten minutes to put on. *See* Dkt. No. 35-2 at ¶¶ 104-05.

Defendant insists that Sergeants are not expected to arrive at work before the start of their scheduled shifts, employees must punch in before doing any work, and employees are compensated for pre-shift work if it is noted on their timecards. *See* Dkt. No. 38-19 at ¶¶ 109-10. The parties agree that Sergeants have never been disciplined for performing a shift briefing, creating zone assignments, or doing other preparatory work before clocking in. *See* Dkt. No. 35-2 at ¶¶ 111-14; Dkt. No. 38-19 at ¶¶ 111-14. Moreover, the parties do not dispute that the County is

7

unaware of any supervisor being disciplined for allowing a Sergeant to create zone assignments or do a shift briefing before clocking in. *See* Dkt. No. 35-2 at ¶ 115; Dkt. No. 38-19 at ¶ 115.

**D.    Investigators' Alleged Unpaid Work**

Investigators work four ten-hour shifts per week. *See* Dkt. No. 35-2 at ¶ 116; Dkt. No. 38-19 at ¶ 116. Plaintiffs allege that Investigators must perform preparatory tasks at the start of each shift, such as logging into computers and reading case reports, and that they arrive approximately fifteen minutes early to begin those tasks. *See* Dkt. No. 35-2 at ¶¶ 119-20, 122-24. Defendant maintains that those tasks are to be performed while the employee is on the clock, and employees are compensated for pre-shift time worked if it is noted on their timecards. *See* Dkt. No. 38-19 at ¶¶ 119, 122-24. Investigators dress in business casual attire and do not wear uniforms. *See* Dkt. No. 35-2 at ¶ 118; Dkt. No. 38-19 at ¶ 118. Investigators have not been disciplined for logging into their computers prior to clocking in, and the County is not aware of any supervisor being disciplined for allowing Investigators to do so. *See* Dkt. No. 35-2 at ¶¶ 125-26; Dkt. No. 38-19 at ¶¶ 125-26.

**E.    SROs' Alleged Unpaid Work**

SROs' schedules vary based upon the schools to which they are assigned. *See* Dkt. No. 35-2 at ¶¶ 127-28; Dkt. No. 38-19 at ¶¶ 127-28. They wear the same uniform as Deputy Sheriffs. *See* Dkt. No. 35-2 at ¶ 130; Dkt. No. 38-19 at ¶ 130. According to Plaintiffs, supervisors have instructed SROs to write their scheduled shift times on their digital timecards, rather than their actual arrival times. *See* Dkt. No. 35-2 at ¶¶ 132-33. Defendant challenges those allegations and asserts that SROs "are not and have not been instructed to perform work activities prior to the start of their scheduled shifts." Dkt. No. 38-19 at ¶¶ 132-33. Plaintiffs claim that regardless of whether an SRO records their shift start time or actual arrival time on their timecard, they are only

paid for their scheduled shift time.  Dkt. No. 35-2 at ¶ 134.  Defendant claims that if an SRO is "required to report to a school outside of their scheduled shift, [they] notate their shift time on their time sheets and are compensated for that time."  Dkt. No. 38-19 at ¶ 134.

**F.      K-9 Officers' Alleged Unpaid Work**

K-9 Officers work eight-hour shifts.  *See* Dkt. No. 35-2 at ¶ 135; Dkt. No. 38-19 at ¶ 135. Instead of reporting to a duty station, they report directly to the field based on the daily assignment email.  *See* Dkt. No. 35-2 at ¶ 137; Dkt. No. 38-19 at ¶ 137.  K-9 Officers are called into service fifteen minutes after their scheduled shift start time.  *See* Dkt. No. 35-2 at ¶ 139; Dkt. No. 38-19 at ¶ 139.  They are assigned a canine and are responsible for canine care.  *See* Dkt. No. 35-2 at ¶ 140; Dkt. No. 38-19 at ¶ 140.  K-9 Officers used to have a "canine hour" built into their shifts—usually the last hour—for canine care.  Dkt. No. 35-2 at ¶ 141; Dkt. No. 38-19 at ¶ 141. However, Plaintiffs claim that K-9 Officers regularly used that hour to respond to calls.  *See* Dkt. No. 35-2 at ¶ 142.  Defendant asserts that K-9 Officers would only have been expected to respond to emergencies.  *See* Dkt. No. 38-19 at ¶ 142.  Plaintiffs claim that when K-9 Officers could not care for their canines during the designated canine hour, they had to perform that care outside of their scheduled shifts and were denied overtime for those hours.  *See* Dkt. No. 35-2 at ¶¶ 143-44. Defendant challenges those allegations and states that "[i]f [P]laintiffs accrued overtime relating to canines, the [C]ounty would pay that."  Dkt. No. 38-19 at ¶ 144.  The parties do not dispute that in 2025, the County replaced canine hours with a canine stipend to cover canine care.  *See* Dkt. No. 35-2 at ¶ 145; Dkt. No. 38-9 at ¶ 145.

**G.      Defendant's Pay Rate Calculations and Timeliness of Overtime Payments**

The parties agree that Plaintiffs' overtime compensation rate is one-and-a-half times their regular hourly rate.  *See* Dkt. No. 35-2 at ¶ 158; Dkt. No. 38-19 at ¶ 158.  However, they disagree

on whether certain premium payments are included in the regular rate computation. *See* Dkt. No. 35-2 at ¶ 159; Dkt. No. 38-19 at ¶ 159. Plaintiffs contend that, according to their expert witness, Defendant's payroll data shows a failure to include "premiums in lieu of health insurance[,] extra duty premiums[,] K-9 care premiums[,] retroactive lump sum payments resulting from contractual pay increases," and other payments in the regular rate calculation. Dkt. No. 35-2 at ¶¶ 160-61 (internal quotation marks omitted). Defendant argues that "[p]remium payments are included in the regular rate." Dkt. No. 38-19 at ¶ 161.

Additionally, Plaintiffs state that they regularly ask the Sheriff's Office Clerks about missing or underpaid overtime, and that Bessette reaches out to employees if there appears to be an error on a timecard. *See* Dkt. No. 35-2 at ¶¶ 166-68. Defendant states that the County's standard practice is to ensure employees are paid for all time worked, and that brief payment delays sometimes occur due to employees' errors on their timecards. *See* Dkt. No. 38-19 at ¶¶ 166-68. The parties agree that Defendant's payroll system tracks employees' overtime and the corresponding payments. *See* Dkt. No. 35-2 at ¶ 169; Dkt. No. 38-19 at ¶ 169.

## H.    Defendant's Efforts to Comply with the FLSA

Plaintiffs allege that Defendant has not investigated whether employees are actually working before their scheduled shifts or whether the alleged pre-shift tasks are compensable, made any changes to its pay practices since an earlier FLSA lawsuit against it, reviewed any legal authority, or sought legal advice independent of this action to determine whether its pay practices are FLSA-compliant. *See* Dkt. No. 35-2 at ¶¶ 170-85, 188. Defendant claims otherwise and insists that it regularly consults with its labor counsel to ensure FLSA compliance. *See* Dkt. No. 38-19 at ¶¶ 170-85, 188. The parties also disagree on whether Defendant has trained supervisors

10

how to handle employees' attempts to work off the clock. *See* Dkt. No. 35-2 at ¶¶ 186-87; Dkt. No. 38-19 at ¶¶ 186-87.

### III. DISCUSSION

**A.      Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried, and that the undisputed facts warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Substantive law determines which facts might affect the outcome of the suit under the governing law and are therefore material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In assessing the record to determine whether any issues of material fact exist, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See Anderson*, 477 U.S. at 248 (citation omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine, material, unresolved issue for trial. *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citations omitted). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "To defeat summary judgment, therefore, nonmoving parties must do more than simply show that

there is some metaphysical doubt as to the material facts, . . . and they may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (internal quotation marks omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Catrett*, 477 U.S. at 324.

**B.      Defendant's Failure to Compensate Plaintiffs for Overtime Worked**

Plaintiffs argue that they are entitled to judgment as a matter of law on their first claim because "the County fails to pay for any of Plaintiffs' daily pre-shift work." Dkt. No. 35-1 at 9. In opposition, Defendant argues that material factual disputes preclude summary judgment because (1) Defendant has no actual or constructive knowledge of Plaintiffs performing pre-shift work; (2) Plaintiffs mischaracterize the quarter-hour rounding system; and (3) Plaintiffs have been instructed to clock in before starting work. *See* Dkt. No. 38-18 at 2-4. Defendant does not dispute that the FLSA and its overtime requirements apply to the parties.

"[T]he FLSA requires employers to pay overtime to covered employees who work more than 40 hours in a week." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 81 (2018) (citing 29 U.S.C. § 207(a)). "To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) (citations omitted). The FLSA does not define "work," but it does define "employment" as "'work' that is 'suffer[ed] or permit[ted].'" *Beardsley v. Cnty. of Saratoga*, No. 1:23-CV-1641, 2026 WL 265997, *4 (N.D.N.Y. Feb. 2, 2026), *appeal filed*, No. 26-405 (2d Cir. Feb. 24, 2026) (quoting 29 U.S.C. § 203(g)). On the knowledge component, "'[a]n employer has constructive knowledge of work if it should have known about the work

12

through the exercise of reasonable diligence.'" *Id.* at *8 (quoting *Perry v. City of New York*, 78 F.4th 502, 512 n.8 (2d Cir. 2023)).

"[O]nce an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours." *Kuebel*, 643 F.3d at 363. Moreover, "an employer is obligated to take action to stop work that it does not want to pay for[,]" and must pay employees "'for all work [the employer] know[s] about, even if [it] did not ask for the work, even if [it] did not want the work done, and even if [it] had a rule against doing the work.'" *Beardsley*, 2026 WL 265997, at *7 (quoting *Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017)).

> As the Second Circuit has explained, "[i]f the employer suffers or permits the work—either by requiring it, knowing about it, or failing to exercise reasonable diligence to discover it—then it must compensate the employee, even if the employee failed to report the work and even if the employer did not know that the employee was working unpaid."

*Id.* at *5 (quoting *Perry*, 78 F.4th at 509).

For the reasons stated below, Plaintiffs are entitled to judgment as a matter of law on all their overtime claims, except those regarding uniform changes before starting compensable work.

### 1. Defendant's Rounding Policy

As already described, Plaintiffs allege that members of each represented job classification have worked without pay prior to their shifts' start times. They also claim they are not permitted to clock in any earlier than seven minutes prior to their scheduled start times, and even if they clock in during that window, they are not paid the corresponding overtime because of Defendant's rounding policy. The record evidence supports the existence of this policy. For example, Bessette's testimony confirms that an employee who clocks in up to seven minutes early or clocks

out up to seven minutes late does not have those additional minutes counted in their total time worked, and that the policy applies to Plaintiffs. *See* Dkt. No. 35-7 at 49:5-20, 53:12-23, 54:1-8.[5] Additionally, the Sheriff's Office's written overtime policy provides that, without approval, employees may not clock in any earlier than seven minutes prior to their scheduled start times or clock out any later than seven minutes after their scheduled end times. *See* Dkt. No. 35-4; *see also* Dkt. No. 38-8 at 40:20-25, 45:25, 46:1-3, 52:1-6 (Maswich testifying that Deputy Sheriffs, Sergeants, and Investigators are subject to the seven-minute rule).

Defendant does not dispute that a clock-out time within seven minutes after a shift's scheduled end time is rounded down to the nearest quarter-hour. *See* Dkt. No. 38-19 at ¶ 30. It does challenge Plaintiffs' assertion that overtime is only ever rounded down instead of up and insists that employees must clock in before they start working. *See id.* at ¶¶ 31-32. Defendant does not directly deny Plaintiffs' allegation that the seven-minute rule dictates when employees can clock in or out. *See id.* at ¶ 31. Defendant instead cites the Sheriff's Office Policy Manual, which confirms that employees may not work overtime without supervisor approval, *see* Dkt. No. 38-3 at 514, and the CBA, *see* Dkt. No. 38-4, for the proposition that if an employee clocks in more than seven minutes before their shift, that time will be rounded up, *see* Dkt. No. 38-19 at ¶¶ 31-32. However, Defendant provides no page number in its reference to the CBA, and the Court was unable to locate any mention in the CBA of a rounding-up policy.

The uncontroverted evidence of the rounding-down policy, although not dispositive, provides important context for Plaintiffs' claims. Because the FLSA requires overtime payments for hours worked in excess of forty per week, the Court examines the factual record to determine

---

[5] Some deposition transcripts in the record were repaginated upon filing, but others were not. For consistency, the Court cites to the transcripts' original page and line numbers.

whether it establishes that Plaintiffs worked uncompensated overtime with Defendant's actual or constructive knowledge of the work.  With respect to each job classification's overtime claims, Defendant argues that it has "no knowledge of pre-shift work being performed and [has] no reason to have such knowledge."  Dkt. No. 38-18 at 3.

### 2. Compensability of Plaintiffs' Pre-Shift Work

#### a. Deputy Sheriffs and Sergeants

Plaintiffs argue that Deputy Sheriffs arrive at work between ten and thirty minutes early and perform compensable work off the clock, including "logging into the computer to view case reports, speaking to Sergeants or Lieutenants, receiving necessary paperwork, obtaining keys, a body camera, radio, and shotgun, donning their required uniform in the locker room, and retrieving and donning required equipment."  Dkt. No. 35-1 at 10-11.  Likewise, Plaintiffs state that Sergeants arrive at work between fifteen and fifty minutes early to conduct shift exchanges (which create a *de facto* overlap with the end of the prior shift), create and disseminate zone assignments, gather their equipment, and put on their uniforms.  *See id.* at 12.  Before calling into service, Deputy Sheriffs and Sergeants also inspect their vehicles and log into the vehicles' computers.  *See id.* at 11-12.

The deposition testimony of Plaintiffs Ferris, Kyne, Rossi, and Kitts supports Plaintiffs' allegations regarding Deputy Sheriffs' pre-shift work.  *See* Dkt. No. 35-10 at 37:14-25, 38:2-25, 39:2-25, 40:2-25, 41:2-20 (Ferris testifying that when he was a Deputy, he would arrive up to thirty minutes early, log into his computer, speak with a Sergeant, and put on his uniform, and that he was never disciplined for doing so); Dkt. No. 35-12 at 43:7-25, 44:2-15, 45:14-25, 46:2-14 (Kitts testifying that, as a Deputy, he arrives ten minutes early, changes into his uniform, sometimes speaks with a Sergeant or Lieutenant, and obtains paperwork and patrol car keys); Dkt.

15

No. 35-13 at 32:23-25, 33:2-25, 34:2-17 (Kyne testifying that when he was a Deputy, he would arrive for a 3:00 PM shift at 2:30 PM to do uncompensated preparatory work before being called into service at 3:15 PM); Dkt. No. 35-15 at 14:24-25, 15:2-9, 16:9-14 (Rossi testifying that when he was a Deputy, he would arrive at work fifteen minutes early, begin changing into his uniform, and clock in seven minutes early).

Similarly, the deposition testimony of Plaintiffs Ferris, Kitts, Kyne, Mahan, and Swatling supports the allegations regarding Sergeants' pre-shift work. *See* Dkt. No. 35-10 at 42:12-25, 43:2-25, 44:2-25, 45:2-25, 46:2-10 (Ferris testifying that, as a Sergeant, he arrives between twenty and thirty minutes early to log into the computer, email the shift briefing to employees, supervisors, and administrative staff shortly before the start of his shift, change into his uniform, and clock in seven minutes prior to his shift); Dkt. No. 35-12 at 40:4-25, 41:2-25, 42:2-25, 43:2 (Kitts testifying that when he was a Sergeant, he would arrive fifteen minutes early to log into the computer, set up the schedule, change into his uniform, and clock in seven minutes prior to his shift, and that he was never disciplined for this); Dkt. No. 35-13 at 29:18-25, 30:2-25, 31:2-25, 32:2-22 (Kyne testifying that, as a Sergeant, he arrives thirty minutes early, logs into the computer, sends the schedule before the start of his shift, puts on his uniform, and clocks in seven minutes before his shift begins); Dkt. No. 35-14 at 15:17-20, 17:9-25, 18:2-15, 19:18-25, 20:2-25, 39:18-24 (Mahan testifying that he arrives thirty minutes early to complete paperwork, send the shift email before the shift begins, put on his uniform in the locker room, and get his patrol vehicle ready); Dkt. No. 35-16 at 19:8-15, 32:16-25, 33:2-25, 34:2-25, 35:2-25, 36:2-25, 37:2-25, 38:2-9 (Swatling testifying that he would arrive forty-five to fifty minutes early, debrief with someone from the previous shift, and send the zone assignments, and that he would stay late to do an information exchange with a Sergeant on the next shift).

16

Defendant fails to meaningfully dispute Plaintiffs' evidence of this uncompensated overtime work. *See* Dkt. No. 38-18 at 2-4. In a separate but similar case involving Saratoga County Sheriff's Office employees' claims for uncompensated overtime,[6] U.S. District Judge Anthony Brindisi recently held that obtaining job equipment, logging into necessary computer programs, and facilitating a shift change constitute compensable work under the FLSA. *See Beardsley*, 2026 WL 265997, at \*3, \*6. Thus, the Court determines that such pre-shift conduct is also compensable here.

The Court reaches a different conclusion for certain employees' time spent donning their uniforms, as some evidence in the record contradicts Plaintiffs' claims that they must put on their uniforms at work. An internal Sheriff's Office memo dated March 31, 2020, states that "Corrections Division Staff" are permitted to wear their uniforms to and from work with an extra article of clothing over the uniform shirt. Dkt. No. 38-2. The memo indicates that employees "will not be compensated to change into or out of [their] uniform[s]." Dkt. No. 38-2. Simultaneously, a sworn affidavit from Maswich suggests that changing into a uniform in the locker room is compensable. *See* Dkt. No. 38-17 at ¶ 8. According to Maswich's affidavit and deposition testimony, the change-at-home policy began as a COVID-era effort to reduce congregation at the workplace, and the Sheriff's Office subsequently maintained the policy.[7] *See* Dkt. No. 38-8 at 65:13-20; Dkt. No. 38-17 at ¶ 13.

---

[6] Plaintiffs presented *Beardsley v. County of Saratoga* as supplemental authority to the Court on February 3, 2026, after the summary judgment motion was fully briefed. *See* Dkt. No. 40. Defendant did not respond to that filing. The County initially appealed *Beardsley* to the Second Circuit, but has since withdrawn the appeal.

[7] Although the deposition testimony mentions the policy's inclusion in the Sheriff's Office Policy Manual, which Defendant submits alongside its opposition papers, *see* Dkt. No. 38-8 at 63:3-4 (identifying Policy 1021 as the policy permitting employees to don their uniforms at home), the

17

In *Beardsley*, Judge Brindisi determined that for employees who put on their uniforms *after* beginning compensable work, "the 'continuous workday' rule makes [that] time compensable under the FLSA." *Beardsley*, 2026 WL 265997, at *7 (citing *Perry*, 78 F.4th at 525 n.20). The continuous workday rule "provides that '[p]eriods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked.'" *Kuebel*, 643 F.3d at 359 (quoting *Singh v. City of New York*, 524 F.3d 361, 371 n.8 (2d Cir. 2008)). It follows that if an employee changes into their uniform after beginning compensable work-related activities, the time spent changing is also compensable.

For those employees who change into their uniforms *before* starting compensable work, Plaintiffs premise their overtime argument on the allegation that employees are required to don their uniforms at their workplaces, and that the requirement makes that time compensable. *See* Dkt. No. 35-1 at 16-17. However, as already described, the record evidence suggests that employees may be permitted to change at home before coming to work. Although some Plaintiffs "testified that they are required to change in the locker room," *id.* at 16, the record indicates a dispute as to that material fact.

A pre-shift uniform change may be compensable if it is "'an integral and indispensable part of [the employee's] principal activities.'" *Perez v. City of New York*, 832 F.3d 120, 123 (2d Cir. 2016) (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 30 (2005)). The "integral and indispensable" inquiry is highly "fact-dependent," *Kuebel*, 643 F.3d at 359 (citing *Reich v. N.Y.C. Transit Auth.*, 45 F.3d 646, 650 (2d Cir. 1995)), and the Second Circuit interprets it "extremely

---

policy appears to be missing from the filed version of the manual, *see* Dkt. No. 38-3 at 36 (showing the Policy Manual's table of contents, which skips Policy 1021).

narrowly[,]" *Adams v. Alcoa, Inc.*, 822 F. Supp. 2d 156, 162 (N.D.N.Y. 2011). "An activity is . . . 'integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities.'" *Perez*, 832 F.3d at 124 (quoting *Integrity Staffing Sols. v. Busk*, 574 U.S. 27, 33 (2014)). Relevant considerations include whether the task is performed "for the employer's benefit" and whether the employer requires employees to complete the task at the workplace.[8] *Id.* (citations omitted). Given the material factual dispute over whether Plaintiffs are required to put their uniforms on at work, it is possible that a reasonable factfinder would decide that Plaintiffs have not satisfied the "integral and indispensable" standard.

The Court acknowledges Plaintiffs' argument that time spent donning a uniform is compensable if most employees regularly change at work due to industry custom, and their reliance on a Third Circuit case for that proposition. *See* Dkt. No. 35-1 at 16 (citing *Tyger v. Precision Drilling Corp.*, 78 F.4th 587, 593 (3d Cir. 2023)). Plaintiffs testified that because they do not want to be identified as police officers when off duty, they would don their uniforms at work even if they had permission to get dressed at home. *See, e.g.*, Dkt. No. 35-10 at 24:18-25, 25:2-8; Dkt. No. 35-12 at 27:21-24; Dkt. No. 35-13 at 16:21-25, 17:2-13; Dkt. No. 35-15 at 17:24-25, 18:2-15; Dkt. No. 35-16 at 26:13-24. In *Tyger*, the Third Circuit discussed various courts' approaches to the "integral and indispensable" standard, and identified a multifactor approach that examines whether most employees change on site due to necessity or custom, *see Tyger*, 78 F.4th at 593 (citing *Steiner v. Mitchell*, 350 U.S. 247, 250-51 & n.1 (1956)), whether

---

[8] When considering the integrality and indispensability of protective gear specifically, the Second Circuit requires courts to determine "whether the gear—however generic or specialized—guards against 'workplace dangers' that accompany the employee's principal activities and 'transcend ordinary risks.'" *Perez*, 832 F.3d at 127 (quoting *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 593 (2d Cir. 2007)).

19

workers have any "'meaningful option' to change at home," *id.* (quoting *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 368 (4th Cir. 2011)), the presence of any regulatory requirement for workers to change on the premises, *see id.*, the nature of the employees' gear, *see id.*, and whether use of the uniform is reasonably necessary for safe and effective performance of the job, *see id.* at 594. Majority practice was one factor in the court's decision; it was not independently dispositive. *See id.* at 595. Ultimately, the Third Circuit held that the district court erred in granting summary judgment because material factual disputes were present as to this issue. *See id.* Accordingly, in the present case, the Court does not find dispositive Plaintiffs' widespread preference for changing into their uniforms on the employer's premises.

Because there exists a dispute of material fact as to whether Plaintiffs must change into their uniforms on the employer's premises, the Court cannot conclude that Defendant is liable, as a matter of law, with respect to Plaintiffs' time spent donning uniforms *before* starting compensable work.

### b. *Investigators*

Plaintiffs argue that Investigators perform uncompensated pre-shift work, such as "logging into the numerous computer programs that are necessary to perform their jobs and reading necessary case reports for their shift." Dkt. No. 35-1 at 13. Furthermore, Plaintiffs claim that because Investigators may not clock in any earlier than seven minutes prior to their shift start times, this work goes unpaid. *See id.* Plaintiff Rossi's deposition testimony supports these allegations. *See* Dkt. No. 35-15 at 29:12-25, 30:2-25, 31:2-4 (Rossi testifying that he arrives fifteen minutes early, logs into the computer systems, begins reading cases that were assigned to him, and clocks in seven minutes prior to his shift start time, for which he has not been disciplined). Aside from generally asserting that Plaintiffs are required to clock in before

20

working, Defendant fails to meaningfully dispute Plaintiffs' allegations or identify contrary evidence in the record. *See* Dkt. No. 38-19 at ¶¶ 116-24. Moreover, as Judge Brindisi held in *Beardsley*, logging into computer programs and beginning one's job functions early are compensable under the FLSA. *See Beardsley*, 2026 WL 265997, at *3, *6. Thus, the Court finds that Plaintiffs have established compensable unpaid overtime work for the Investigators.

### c. SROs

As for SROs, Plaintiffs claim "that they routinely arrive to their assigned school before the start of their scheduled shift in order to be working and ready when kids arrive at school." Dkt. No. 35-1 at 14. SROs also allegedly "often stay late, beyond their scheduled shifts, to finish up work-related tasks[,]" without compensation for that time. *Id.* Plaintiffs claim that SROs are instructed to write only their scheduled start and end times on their timecards, and even if they logged overtime, they would only be paid for eight hours per shift. *See id.* The record shows that SROs have failed to enter overtime worked on their timecards, *see* Dkt. No. 35-8 at 22:8-25; Dkt. No. 35-10 at 42:6-11, and Plaintiff Grigas testified that a Lieutenant previously told him to log only his scheduled shift times, *see* Dkt. No. 35-11 at 39:21-25, 40:2-8. Plaintiff Grigas also testified that, in the past, even when he logged overtime, he was only paid for his eight-hour shifts. *See id.* at 40:14-19. Moreover, the record establishes that SROs report to work before students get off their buses, which is sometimes earlier than the SROs' scheduled start times. *See id.* at 21:17-24 (Grigas testifying that he is expected to call into service by the time students arrive at school, which is prior to his 8:00 A.M. scheduled start time), 39:17-20 (Grigas testifying that he arrives at school around 7:52 A.M.), 39:23-25 (Grigas testifying that he was instructed to write 8:00 A.M. on his timecard).

Defendant denies that SROs have been instructed to work outside their shifts, argues that any overtime work would be paid, and points vaguely to the Policy Manual and an unsupportive section of Plaintiff Bedell's deposition testimony, *see* Dkt. No. 38-19 at ¶¶ 132-34, but does not adduce any evidence refuting Plaintiffs' claims that SROs have worked off the clock without compensation. Defendant likewise does not dispute that the actions taken by SROs before the start of their shift are compensable. Thus, there is no material factual dispute as to whether SROs have engaged in overtime work that is compensable under the FLSA.

### d. K-9 Officers

Plaintiffs argue that, when the Sheriff's Office utilized "canine hour," K-9 Officers frequently spent their own off-the-clock time taking care of their canines instead. *See* Dkt. No. 35-1 at 15. Although K-9 Officers were supposed to care for their canines during canine hour—which was a paid part of their shifts—Plaintiffs allege that K-9 Officers often spent that time responding to service calls or emergencies, which derives support from the record. *See id.*; Dkt. No. 35-9 at 26:5-15, 27:17-22 (Brownell testifying to "several" occasions where he could not care for his canine during canine hour because he was responding to calls, cared for the canine on his own time instead, and was not compensated for it). They also argue—and the record shows—that when Plaintiffs requested overtime to compensate them for off-the-clock canine care, Defendant refused. *See* Dkt. No. 35-2 at ¶¶ 143-44; Dkt. No. 35-9 at 27:6-9. In opposition, Defendant argues that "[t]he only situation where a K-9 [O]fficer would respond to a call during K-9 hour was in an emergency situation[,]" Dkt. No. 38-19 at ¶ 142, and insists that the County would pay any accrued overtime relating to canine care, *see id.* at ¶ 144; Dkt. No. 38-6 at 73:3-6.

Maswich testified that K-9 Officers would be off their radios during canine hour and would not typically respond to calls, unless there was an emergency and no other officers were

22

available.  *See* Dkt. No. 38-8 at 57:24-25, 58:1-5.  Both parties cite this testimony to support their respective arguments.  *See* Dkt. No. 35-2 at ¶ 142; Dkt. No. 38-19 at ¶ 142.  Although they appear to dispute whether K-9 Officers were expected to respond to service calls in addition to emergencies, the record establishes that K-9 Officers did respond to at least some calls during canine hour and used their own time to care for their canines.  The parties do not dispute that K-9 Officers are responsible for caring for their canines, *see* Dkt. No. 35-2 at ¶ 140; Dkt. No. 38-19 at ¶ 140, and the record shows that canine care includes feeding and bathing, *see* Dkt. No. 35-9 at 20:10-13; Dkt. No. 38-8 at 56:18-24.  The Second Circuit has recognized that "walking, feeding, training, grooming[,] and cleaning up [after]" a police canine as required by the employer constitute compensable work for a canine unit officer.  *Reich*, 45 F.3d at 651.

Because Defendant does not specifically controvert Plaintiffs' evidence that K-9 Officers cared for their canines off the clock and without pay, the Court finds that Plaintiffs have established, as a matter of law, compensable overtime work by K-9 Officers.

### 3.  *Defendant's Actual or Constructive Knowledge*

For Plaintiffs to prevail as a matter of law on their overtime claims, the record must establish, with no dispute of material fact, that Defendant had actual or constructive knowledge of Plaintiffs' compensable overtime work.  *See Kuebel*, 643 F.3d at 361 (citations omitted).  Constructive knowledge exists if the employer "'should have known about the work through the exercise of reasonable diligence.'"  *Beardsley*, 2026 WL 265997, at *8 (quoting *Perry*, 78 F.4th at 512).  Likewise, if supervisors observe or otherwise know about employees' overtime work, that knowledge is imputed to the employer.  *See Foster v. City of New* York, No. 14-CV-4142, 2017 WL 11591568, *20 (S.D.N.Y. Sept. 30, 2017), *abrogated on other grounds*, *Perry*, 78 F.4th at

23

509.  Importantly, the employer knowledge requirement extends only to performance of the work; an employer need not know that the work was unpaid.  *See Perry*, 78 F.4th at 509.

Defendant denies any knowledge of the overtime work alleged by Plaintiffs, reiterates that it trained employees not to work off the clock, and asserts that Plaintiffs never used the County's grievance system to report suspected FLSA violations.  *See* Dkt. No. 38-18 at 4-5.  Defendant also argues that no supervisor or administrator witnessed the overtime work being performed.  *See id.* at 5.  Plaintiffs contend that interactions between Plaintiffs and their supervisors, as well as records of employees' building access times, put Defendant on at least constructive notice.  *See* Dkt. No. 35-1 at 20-21.

### a.  Deputy Sheriffs

"Courts often rely on deposition testimony from employees themselves about what their supervisors knew regarding uncompensated overtime."  *Worley v. City of New York*, No. 17-CV-4337, 2020 WL 730326, *5 (S.D.N.Y. Feb. 12, 2020) (citation omitted).  As Judge Brindisi acknowledged in *Beardsley*, and other district courts have recognized, "evidence of physical proximity to supervisors[] or work-related interactions with supervisors[] during contested work periods" can show an employer's constructive knowledge of overtime work.  *Beardsley*, 2026 WL 265997, at *8 (citing *Lynch v. City of New York*, 291 F. Supp. 3d 537, 550 (S.D.N.Y. 2018); *Huang v. GW of Flushing I, Inc.*, No. 17-CV-3181, 2021 WL 54085, *4 (E.D.N.Y. Jan. 6, 2021)); *see also Lawtone-Bowles v. City of New York*, No. 16-CV-4240, 2020 WL 2833366, *3 (S.D.N.Y. June 1, 2020).  Here, the record establishes that Deputy Sheriffs "routinely speak with supervisors . . . prior to the start of their scheduled shift about work-related tasks."  Dkt. No. 35-1 at 20; *see* Dkt. No. 35-10 at 39:19-23 (Ferris testifying that, when he was a Deputy Sheriff, he would speak with a Sergeant about work-related tasks before the start of his shift); Dkt. No. 35-12 at 43:3-25,

24

44:2-25, 45:2-21 (Kitts testifying that, as a Deputy Sheriff, he has spoken with Sergeants and Lieutenants about work-related tasks before his shift started); Dkt. No. 35-16 at 43:15-19 (Swatling testifying that his supervisors "all knew" that he was sometimes not compensated for time worked). Defendant denies that any of these communications were work-related, but does not cite any record evidence for that proposition or otherwise rebut Plaintiffs' showing of pre-shift interactions. *See* Dkt. No. 38-19 at ¶ 151. With reasonable diligence, Defendant should have known about the overtime work through its supervisory staff. Thus, the Court finds that the record establishes Defendant's constructive knowledge of Deputy Sheriffs' overtime work.

### b. Sergeants

A similar analysis applies to Sergeants. The record shows that Sergeants have routinely emailed their shift schedules, with their supervisors and higher-ranking individuals copied on the message, before their scheduled shifts began. *See* Dkt. No. 35-10 at 42:12-25, 43:2-25, 44:2-21 (Ferris testifying that, as a Sergeant, he would send the shift briefing before his shift started, with supervisors, administrative staff, Lieutenants, and Captains copied); Dkt. No. 35-12 at 42:3-17 (Kitts testifying that, as a Sergeant, he would arrive at work early to disseminate the schedule as soon as possible and was never disciplined for it); Dkt. No. 35-13 at 29:18-25, 30:2-25, 31:2-6 (Kyne testifying that, as a Sergeant, he arrives early, sends the schedule before his shift starts, and copies Lieutenants, Captains, the Chief, and the Sheriff on the message); Dkt. No. 35-14 at 42:17-21 (Mahan testifying that the scheduling email goes to "[a]nyone working as a [D]eputy that day and all ranks above [D]eputy"). In attempting to rebut this evidence, Defendant asserts only that the shift email is sent at the beginning of the shift and Plaintiffs are required to clock in before working. *See* Dkt. No. 38-19 at ¶ 148. Defendant does not identify any evidence to properly dispute constructive knowledge based on the emails.

25

Additionally, the record establishes that Sergeants are required to perform shift exchanges, *see* Dkt. No. 35-16 at 32:19-25, 33:2-22, 37:16-25, 38:2-9 (Swatling testifying that as a Sergeant, he would arrive early and stay late to facilitate shift exchanges before and after his shifts), which further establishes Defendant's constructive knowledge of Sergeants working outside their scheduled shifts. Defendant does not dispute that the shift briefings are mandatory; it simply attempts to dispute the timing of the shift briefings with no specific citations to record evidence. *See* Dkt. No. 38-18 at ¶ 94.

If Defendant did not know about Sergeants' overtime work, it should have discovered it through reasonable diligence. Thus, the record establishes Defendant's constructive knowledge of Sergeants' overtime work.

### c.  *SROs and K-9 Officers*

As for SROs and K-9 Officers, Plaintiffs argue that the interactions putting Defendant on notice were even more clear. For example, "SROs testified that they have spoken with supervisors about whether to record their shift time or the time they actually arrive and are working on their timecards." Dkt. No. 35-1 at 21; *see* Dkt. No. 35-11 at 39:21-25, 40:2-8 (Grigas testifying that a Lieutenant told him he needed to write his shift start time on his timecard), 40:14-19 (Grigas testifying that SROs were originally told to input their actual hours worked, but they were only paid for their scheduled eight-hour shifts). Likewise, the record shows that K-9 Officers told their supervisors they cared for their canines on their own time and requested overtime pay, which was denied. *See* Dkt. No. 35-9 at 27:6-9 (Brownell testifying about K-9 Officers' request for overtime). None of Defendant's proffered evidence refutes Plaintiffs' showing that supervisory personnel knew about these discrepancies, and the Court finds that Defendant possessed the requisite knowledge of SRO and K-9 Officers' overtime work.

26

### d. Investigators

To establish Defendant's knowledge of Investigators' off-the-clock work, Plaintiffs point to cameras and electronic fob access to the Public Safety Building, where Investigators work. *See* Dkt. No. 35-1 at 20. Under the specific circumstances of *Beardsley*, Judge Brindisi held that an electronic access log, camera footage of the plaintiffs arriving at work early, and electronic key fob access records, which administrative staff and certain plaintiffs' supervisors could access, supported a finding that the County had at least constructive knowledge of the plaintiffs' overtime work. *See Beardsley*, 2026 WL 265997, at *8.

The Second Circuit has not directly spoken on this issue, but the Court acknowledges authority outside this circuit stating that the mere existence of records showing an employee's whereabouts or work status at a certain time is not, by itself, always enough to establish actual or constructive knowledge of overtime work. *See Hertz v. Woodbury Cnty.*, 566 F.3d 775, 782 (8th Cir. 2009) (citation omitted). In *Hertz*, the Eighth Circuit determined that requiring county officials to "weed through non-payroll [dispatch] records to determine whether or not its employees were working beyond their scheduled hours" did not rise to the "should have known" threshold for constructive knowledge. *See id.* The Eighth Circuit expressly acknowledged, however, "the possibility that another case may lend itself to a finding that access to records would provide constructive knowledge of unpaid overtime work." *Id.*

Critically, the constructive knowledge standard asks "what the employer should have known, not what it could have known." *Perry*, 78 F.4th at 513 n.8 (internal quotation marks omitted). The parties do not dispute that Investigators work at the Public Safety Building, *see* Dkt. No. 35-2 at ¶ 9; Dkt. No. 38-19 at ¶ 9; Dkt. No. 35-5 at 51:2-8, which has cameras and badge-controlled access to the parking lot, *see* Dkt. No. 35-2 at ¶¶ 154-55; Dkt. No. 38-19 at ¶¶

27

154-55; Dkt. No. 35-5 at 39:18-19, 107:23-25, 108:1-2.  The Public Safety Building also has controlled access through employee key cards or "fob[s]," and employees' access to the building is electronically recorded.  Dkt. No. 35-12 at 21:12-25, 22:2-16.  Testimony from Plaintiff Kitts establishes that the electronic recordings show when employees arrive at work early, but not that any supervisor should have examined them for payroll purposes.  *See* Dkt. No. 35-12 at 22:17-23.  Although the record shows that Defendant *could* have known about Investigators' overtime work, it does not establish that they *should* have known.  A notable difference between *Beardsley* and this case is that the evidence in *Beardsley* established that certain plaintiffs' supervisors in the Public Safety Building could see their electronic fob swipes in real time.  *See Beardsley*, 2026 WL 265997, at *8.  Those plaintiffs do not include Investigators, however, and there is no allegation here that Investigators' supervisors do or should monitor their building access in this manner.

Despite some factual similarities between this case and *Beardsley*, the record in this case does not establish as a matter of law that Defendant *should* have known Investigators were working overtime based on electronic records.  Thus, Plaintiffs are not entitled to summary judgment on this portion of their unpaid overtime claim.

## C.    Defendant's Failure to Properly Calculate Plaintiffs' Regular Pay Rate

Next, Plaintiffs argue that Defendant miscalculated their regular rate of pay, and by extension, miscalculated their time-and-a-half overtime rate.  *See* Dkt. No. 35-1 at 21-23.  According to Plaintiffs, Defendant improperly excluded extra duty premiums, cash payments in lieu of health insurance for certain employees, canine care stipends for K-9 Officers, and retroactive pay increases from the calculation of Plaintiffs' regular pay rate.  *See id.* at 22.  In opposition, Defendant contends that the CBA incorporates these sums into employees' regular pay

28

rates and requires that time worked in excess of forty hours weekly be paid at one-and-a-half times the regular rate. *See* Dkt. No. 38-18 at 6. Plaintiffs assert that the CBA's directives are not dispositive; rather, liability depends on whether Defendant actually paid overtime at the correct rate. *See* Dkt. No. 39 at 12.

"The FLSA requires employers to pay compensation 'for a workweek longer than forty hours' at an overtime rate, which is defined as 'not less than one and one-half times the regular rate at which he is employed.'" *Beardsley*, 2026 WL 265997, at *9 (quoting 29 U.S.C. § 207(a)). Pursuant to the statute, an employee's regular rate "include[s] all remuneration for employment paid to, or on behalf of, the employee," with some exemptions. 29 U.S.C. § 207(e). The list of exemptions is exhaustive, *see Beardsley*, 2026 WL 265997, at *9 (citing 29 C.F.R. § 778.207(a)), and the burden of invoking FLSA exemptions belongs to the employer, *see Badger v. City of Cortland*, No. 5:23-CV-844, 2024 WL 2804430, *3 (N.D.N.Y. May 31, 2024) (quoting *Bilyou v. Dutchess Beer Distribs. Inc.*, 300 F.3d 217, 222 (2d Cir. 2002)). Defendant does not invoke any of the enumerated exemptions in its opposition papers. *See* Dkt. No. 38-18 at 6. Thus, the parties' disagreement concerns not whether Defendant is required to include the specified sums in its regular rate calculation, but whether the sums were actually included in the calculation.

To establish Defendant's miscalculation of regular pay rates, Plaintiffs rely on an expert report from Dr. Louis Lanier, who holds a doctoral degree in applied economics. *See* Dkt. No. 35-17. Dr. Lanier reviewed payroll data from January 8, 2021, to February 13, 2025, and prepared initial and supplemental reports summarizing his findings. *See id.* at ¶ 3. Dr. Lanier concluded that Defendant failed to include extra duty premiums, cash in lieu of health insurance, canine care stipends, and lump sums from retroactive pay increases in its calculation of Plaintiffs'

29

regular pay rates. *See id.* at ¶ 5. By extension, Dr. Lanier concluded that Plaintiffs' overtime payments were not calculated correctly. *See id.*

Defendant does not offer any expert witness testimony in opposition. Defendant also does not challenge Dr. Lanier's qualifications. Rather, it relies on the CBA to refute Plaintiffs' claims and Dr. Lanier's findings. *See* Dkt. No. 38-19 at ¶¶ 159, 161. Defendant fails to cite specific page numbers or sections of the CBA to support its claim that premium payments were included in the regular rate calculation for Plaintiffs' compensation, *see id.*, and the Court was unable to locate that information in the CBA. Although Maswich's deposition testimony indicates that employees' regular pay rate is dictated at least in part by the CBA pay scale and that the County's payroll data would reflect what is included in an employee's regular rate of pay, *see* Dkt. No. 38-8 at 122:6-20, this evidence does not controvert Dr. Lanier's expert findings.

Thus, because Defendant fails to establish a dispute of material fact as to whether the specified sums were included in Plaintiffs' regular rate calculations, the Court finds that Plaintiffs are entitled to judgment as a matter of law on this claim.

**D.    Defendant's Payment of Overtime and Calculation of Compensatory Time at a Straight Time Rate**

Plaintiffs raise an argument in their summary judgment motion that Defendant violated the FLSA by paying overtime and calculating compensatory time at a straight time rate, rather than a time-and-a-half rate. *See* Dkt. No. 35-1 at 23-24. However, this claim was not asserted in the complaint. *See* Dkt. No. 1. While the second count of Plaintiffs' complaint alleges that Defendant miscalculated Plaintiffs' regular rates of pay (and, based on that error, their overtime rates), *see* Dkt. No. 1 at ¶¶ 38, 49-53, the complaint does not contain allegations that Defendant incorrectly paid overtime or calculated compensatory time at a straight time rate.

Although the claims are factually related, Plaintiffs' straight time argument is distinct from the second count in the complaint. For example, the straight time argument does not depend on a miscalculation of the regular rate. *See* Dkt. No. 35-1 at 23-24. It simply asserts that Plaintiffs were paid their regular rate—whatever that rate may be—for each hour worked in excess of forty, rather than a purported time-and-a-half rate derived from an incorrectly calculated regular rate. *See id.* at 23. Plaintiffs' motion states that "*[i]n addition to* the straightforward and undisputed violations of the FLSA for failing to properly calculate the regular rate, the County *also* violated the FLSA by, at times, paying overtime and compensatory time at a straight time rate, instead of at a time-and-a-half rate." *Id.* (emphasis added). Based on Dr. Lanier's findings, Plaintiffs attribute this alleged error to an *incorrect recording* of overtime hours as regular hours. *See id.* This contrasts with the allegations in the complaint, which attribute low overtime payments to *miscalculation* of the regular rate. *See* Dkt. No. 1 at ¶ 38. Additionally, while the new claim in the summary judgment motion mentions an improper accrual rate for compensatory time, which is separate from overtime pay, the original allegations in the complaint only mention overtime pay. *Compare* Dkt. No. 35-1 at 23, *with* Dkt. No. 1 at ¶¶ 38, 49-53.

Because the straight time claim was not asserted in the complaint, the Court declines to decide its merits. *See Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 224 (S.D.N.Y. 2013) (citing *Avillan v. Donahoe*, 483 Fed. Appx. 637, 639 (2d Cir. 2012) (summary order)) (stating that a party "may not pursue new causes of action [at the summary judgment stage] without having amended its pleadings"). Nevertheless, because Plaintiffs are entitled to judgment as a matter of law on their regular rate miscalculation claim, they are entitled to damages for underpaid overtime based on those miscalculations. The Court reiterates that Plaintiffs are

moving for summary judgment on liability only, so the Court expresses no opinion on the quantum of damages at this juncture.

**E.      Defendant's Failure to Pay Overtime in a Timely Manner**

Next, Plaintiffs argue that Defendant violated the FLSA by failing to pay overtime in a timely manner. *See* Dkt. No. 35-1 at 24-25. Although the FLSA does not require weekly payment of overtime compensation, "[t]he general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends." 29 C.F.R. § 778.106. If the employer cannot determine the correct amount of overtime within that timeframe, the employer must pay the overtime as soon as practicable thereafter. *See id.* "Payment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due[,] and in no event may payment be delayed beyond the next payday after such computation can be made." *Id.*

Courts use an objective standard to determine reasonableness. *See Beardsley*, 2026 WL 265997, at *10 (citing *Rogers v. City of Troy*, 148 F.3d 52, 58 (2d Cir. 1998)). As Judge Brindisi noted in *Beardsley*, although the Second Circuit has not announced a bright-line rule as to what constitutes an unreasonable delay, district courts have found a gap of two weeks to be unreasonable. *See id.* (quoting *Accosta v. Lorelei Events Grp. Inc.*, No. 17-CV-7804, 2022 WL 195514, *4 (S.D.N.Y. Jan. 21, 2022)); *see also Coley v. Vannguard Urb. Improvement Ass'n, Inc.*, No. 12-CV-5565, 2018 WL 1513628, *13 (E.D.N.Y. Mar. 27, 2018) (citations omitted).

Plaintiffs refer the Court to deposition testimony to establish late overtime payments. *See* Dkt. No. 35-2 at ¶ 168; Dkt. No. 35-9 at 23:19-22 (Brownell testifying that some of his overtime payments were delayed); Dkt. No. 35-10 at 34:13-15 (Ferris testifying that he has experienced delays in receiving overtime payments); Dkt. No. 35-11 at 31:19-21 (Grigas testifying that he has

experienced delayed overtime payments); Dkt. No. 35-12 at 33:13-18 (Kitts testifying that he "probably" received late overtime payments, but declining to identify a specific instance); Dkt. No. 35-14 at 34:22-25, 35:2-7 (Mahan testifying that there are "always issues with payroll" and explaining what he would do if he noticed a payroll issue); Dkt. No. 35-15 at 21:25, 22:2-15 (Rossi testifying that he had experienced overtime payment delays and that after he notified a supervisor of the delayed payment, it would be paid in the next paycheck); Dkt. No. 35-16 at 47:18-25, 19:2-7 (Swatling testifying that his paychecks sometimes "lagged," and that he would not be paid until the following pay period two weeks later).  The testimony of Plaintiffs Rossi and Swatling establishes how long the delays were: at least two weeks in some instances, given the biweekly pay schedule.

The parties do not dispute that Plaintiffs are paid biweekly, or that Defendant's payroll system indicates when overtime was worked and when the corresponding payments were made. *See* Dkt. No. 35-2 at ¶¶ 165, 169; Dkt. No. 38-19 at ¶¶ 165, 169.  Likewise, Defendant fails to refute Rossi and Swatling's testimony regarding the two-week delay.  Instead, Defendant blames "brief delay[s]" in overtime payment on employees' own timecard errors.  Dkt. No. 38-19 at ¶ 168.  Defendant cites Bessette's deposition testimony, which establishes Defendant's process of correcting missing timecard entries.  *See* Dkt. No. 38-6 at 59:8-24.  Bessette also testified that although she could not remember any specific instances where incomplete timecard hours were not paid until the following pay period, it was "possible." *Id.* at 59:25, 60:1-9.

Accordingly, Defendant fails to establish an issue of material fact regarding the two-week lateness of overtime payments.  Judge Brindisi recognized a two-week delay as unreasonable in *Beardsley*, and the Court does so here, also. *See Beardsley*, 2026 WL 265997, at *10-11; *see also Leo v. Province Therapeutics, LLC*, No. 23-CV-5418, 2024 WL 2923945, *4-5 (E.D.N.Y. May

21, 2024), *R.& R. adopted*, 2024 WL 2891798 (E.D.N.Y. June 10, 2024) (quoting *Coley*, 2018 WL 1513628, at *13) ("[C]ourts in this Circuit have found two weeks to be 'an unreasonable amount of time' to delay a paycheck").  On this claim, therefore, the Court finds that Plaintiffs are entitled to judgment as a matter of law on Defendant's liability.

**F.      Liquidated Damages**

Finally, Plaintiffs argue that the FLSA entitles them to liquidated damages.  *See* Dkt. No. 35-1 at 25-27.  While the FLSA permits liquidated damages for violations of 29 U.S.C. § 207, *see* 29 U.S.C. § 216(b), "district courts have 'discretion to deny liquidated damages where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective "good faith" with objectively "reasonable grounds" for believing that its acts or omissions did not violate the FLSA[,]'" *Beardsley*, 2026 WL 265997, at *11 (quoting *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008)).  The Second Circuit "has characterized [this] burden as 'a difficult one[.]'"  *Barfield*, 537 F.3d at 150 (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)) (other citation omitted).  "To establish good faith, the employer must take active steps to ascertain the dictates of the FLSA and then act to comply with them." *Herman*, 172 F.3d at 142 (citing *Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)).

Plaintiffs first argue that they are entitled to liquidated damages because Defendant took no active steps to comply with the FLSA.  *See* Dkt. No. 35-1 at 26.  For example, according to Plaintiffs, Defendant "did not research whether its policies complied with the FLSA even after being sued by other members of the Sheriff's Office in a separate FLSA case [*Beardsley*], nor have its payroll system and timekeeping systems been audited or reviewed for FLSA compliance." *Id.*  Human Resources Director Chamberlain's deposition testimony supports

34

Plaintiffs' position. *See* Dkt. No. 35-6 at 29:18-25, 30:1-25, 31:1-25, 35:10-25, 36:1, 37:3-11, 38:22-25, 39:1-9, 41:2-6, 45:14-25, 46:1-21 (Chamberlain testifying that Defendant has not investigated whether employees have worked off the clock before their shifts, changed its pay policies and practices after the *Beardsley* litigation began, trained supervisors on what to do if employees work off the clock, reviewed legal authority or Department of Labor guidance to see whether its pay policies are FLSA-compliant, or sought advice from the Department of Labor or any state agency regarding lawful pay practices). In opposition, Defendant denies knowledge of Plaintiffs working off the clock, insists that Plaintiffs never reported their overtime hours and are required to clock in before working, states that Defendant changed its practices by replacing canine hours with canine stipends, and emphasizes that Chamberlain testified only to his personal knowledge of FLSA compliance efforts. *See* Dkt. No. 38-19 at ¶¶ 170-74, 177-78, 183. However, these points do not raise any dispute of material fact.

Defendant attempts to create a dispute of material fact by claiming that it regularly discusses FLSA compliance with its labor counsel and relies in good faith on labor counsel's advice. *See* Dkt. No. 38-18 at 7; Dkt. No. 38-19 at ¶¶ 175-76, 179-82, 184. Plaintiffs argue that Defendant cannot invoke an advice-of-counsel defense because "the County's own witness admitted that the County never sought advice on the FLSA before this lawsuit [was] filed." Dkt. No. 35-1 at 27 (emphasis removed); *see* Dkt. No. 39 at 14. This lawsuit was filed approximately seven months after the *Beardsley* case began. As Judge Brindisi stated in *Beardsley*, "[t]he advice-of-counsel defense may be relevant to evaluating the party's good faith where the legal advice was sought and rendered *before* the alleged violation occurred." *Beardsley*, 2026 WL 265997, at *12 (emphasis added); *see also United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012) (assessing the advice-of-counsel defense in a non-FLSA context and recognizing three

35

requirements to invoke the defense: (1) seeking advice of counsel in good faith; (2) presenting

counsel with all the facts of the matter; and (3) following counsel's advice in good faith) (citation

omitted); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1194 (2d Cir. 1989) ("[T]he

Supreme Court has emphasized that an advice-of-counsel defense presupposes the defendant's

solicitation of advice in good faith") (citing *Williamson v. United States*, 207 U.S. 425, 453

(1908)).

In *Beardsley*, the defense was unavailable because the same witness—Chamberlain—

testified that to his knowledge, separate and apart from the lawsuit, the County did not seek any

legal advice regarding its pay policies and practices for Sheriff's Office employees. *See*

*Beardsley*, 2026 WL 265997, at *12   Similarly, when deposed for the litigation at bar,

Chamberlain gave the following testimony:

> Q: So separate and apart from any pending litigation, including this lawsuit and the *Beardsley* lawsuit, has the County ever asked for an opinion from an attorney relating to its pay practices for employees in the position of Deputy Sheriff patrolmen, Sergeant and [I]nvestigator?
>
> A: I don't think so, no.
> Q: Okay.
>
> A: Not since I've been here.
>
> Q: Okay.  Does the County have an outside labor counsel?
>
> A: We do, yes.
>
> Q: Okay.  And are there regular meetings with that labor counsel?
>
> A: There's regular communication, yeah.
>
> Q: Okay.  And has the County, non attorney employees of the County ever sought advice from outside labor counsel relating to the pay, policies and practices for Deputy [S]heriffs [p]atrolmen, Sergeants[,] and Investigator[s] separate and apart from any

pending litigation?

A: No.

Dkt. No. 35-6 at 32:18-25, 33:1-16. Thus, it makes sense that when paying employees and processing their timecards before this action commenced, Defendant could not have relied on legal advice it had not yet received. Because Defendant does not adduce any evidence beyond its conclusory statements that it regularly meets with labor counsel, *see id.* at 33:3-8 (Chamberlain testifying generally to Defendant's "regular communication" with labor counsel, but not elaborating on the nature or timing of that communication), the Court agrees with Plaintiffs that the advice-of-counsel defense does not apply.

Accordingly, the Court holds that Plaintiffs are entitled, as a matter of law, to liquidated damages. Again, the Court expresses no opinion on the quantum of damages at this time.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Plaintiffs' motion for summary judgment (Dkt. No. 35) is **GRANTED in part** and **DENIED in part;**[9] and the Court further

**ORDERS** that the parties file a joint status report within **sixty (60) days** of this Memorandum-Decision and Order regarding the calculation of damages, progress toward potential settlement, and/or a proposed timeline for moving for certification of the collective; and the Court further

---

[9] Plaintiffs are entitled to judgment as a matter of law on all claims except: (1) the unpaid overtime claim as to time spent changing into uniforms before completing compensable work; (2) the unpaid overtime claim as to Investigators; and (3) the newly asserted straight time claim, which was not asserted in the complaint. *See supra* Sections III.B.2.a, III.B.3.d, III.D.

**ORDERS** that the Clerk of the Court terminate Shields Nelson from the action; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 19, 2026
      Albany, New York

Mae A. D'Agostino
U.S. District Judge